In the Matter of JOHN T. LITTLE, an Attorney, Respondent.

First Department, November 17, 1916.

Attorney at law disbarred — fraudulent representations made to client — conversion of funds belonging to estate — compulsory restitution no defense.

An attorney at law disbarred for inducing a client, as administratrix, to indorse to him a check representing funds of the estate upon the false representation that the sum had to be deposited in the Surrogate's Court and for converting the proceeds of the check to his own use.

*It seems*, that if the client had actually permitted the attorney to keep the money until the time came for her accounting, it was a violation of sound professional ethics for the attorney to borrow the money without giving collateral security or any written evidence of the debt.

The fact that the attorney being threatened with disbarment proceedings repaid a portion of the moneys converted, does not protect him from disbarment.

DISCIPLINARY PROCEEDINGS instituted by the Association of the Bar of the City of New York against an attorney.

*Michael H. Cardozo, Jr.*, of counsel [*Einar Chrystie*, attorney], for the petitioner.

*George Gordon Battle* of counsel [*Nathan B. Chadsey*, attorney], for the respondent.

CLARKE, P. J.:

The charges of unprofessional conduct set forth by petitioner are as follows: That in September, 1913, the respondent was the attorney for Lavinia Poole, administratrix of the estate of Francena R. Wethers, deceased. There was belonging to the estate $637.37 on deposit in the Queens County Savings Bank,

Flushing. In that month the administratrix, under the advice and direction of the respondent, withdrew the money from the bank and received from the bank a check representing the entire amount. Respondent falsely represented to the administratrix that it would be necessary to deposit the money with the surrogate of Queens county, and under the respondent's direction the administratrix indorsed the check and delivered the check to the respondent. The respondent did not deposit the money or any part of it with the surrogate, but after making legitimate expenditures, amounting to $183, converted the remainder of the money to his own use, and has not paid over any part of it to the administratrix, although she has frequently requested him to do so.

It appears that Francena R. Wethers was an old colored servant, who had been in the employ of respondent's family for upwards of thirty years. She died in August, 1913, leaving two nieces. The respondent and his aunt attended the funeral of Mrs. Wethers, and at that time his aunt told Lavinia Poole, one of the nieces, that if she desired Mr. Little to attend to her business he would do so. Lavinia Poole then spoke to the respondent and he said he would look after her affairs. About a week later the respondent prepared papers for the appointment of Lavinia Poole as administratrix and she was thereafter duly appointed. The respondent obtained waivers from the attorney for the State Comptroller and met Lavinia Poole at the Queens County Savings Bank, where there was on deposit $637.35 belonging to the estate. At that time a check was drawn by the president and cashier of the savings bank to the order of Lavinia Poole, administratrix, for the sum of $637.35 and delivered to her. She then indorsed the check to the order of the respondent and he deposited the check to his personal account in his bank. The balance to the credit of the respondent when the check was deposited was $1.21, with the deposit added it became $638.56, and within two weeks thereafter the account was drawn down to the sum of $157.59.

Lavinia Poole testified that the respondent was to obtain the money for her with which to pay the undertaker's bill; that after she had obtained the check from the bank and met the

First Department, November, 1916.      [Vol. 175.

respondent she and the respondent went over to the railroad depot and there at the request of the respondent she indorsed the check to him, he having told her that if she did not indorse the check he could not pay the undertaker; that she gave the check to the respondent and said to him: "Mr. Little, try to get our money;" that the respondent replied: "You cannot get it, because your aunt died without a will, and you can't get it under a year's time; I have to turn that over to the Surrogate's Court at Jamaica."

Thereafter the respondent paid the undertaker's bill, amounting to $158, and gave Lavinia Poole $25 to pay the rental of the receiving vault.

Upon the expiration of a year from the time letters of administration were granted Lavinia Poole called at the Surrogate's Court at Jamaica and learned that no money belonging to the estate was on deposit there. She then took the matter up with various lawyers, with the result that charges were preferred against the respondent.

The respondent denies that he told her the money had to be deposited with the surrogate. He testified that there being a slight delay in the issuance of the letters, "I saw her once or twice at the house, and the letters had not been issued; she was anxious about them, and so was I; I telephoned over to the clerk's office, and was informed that they had not yet been issued, and I talked with her about the fact that possibly the Surrogate had not accepted or would not accept her sureties; and I said that I could get the National Surety Company to go bondsman for her, but that I did not want to do that because if I did they would require that all the money in the banks be deposited with them. We had some talk on that subject at the house; I said that I did not want to do that; that the money in the New York bank, and the rents she got from the farmer, the property or real estate, she could have herself, and that I would take the money in the Queens County Savings Bank, pay the funeral bill, and pay whatever other expenses there might be, and when the time came to account I would give her the balance with six per cent interest for the time that I had it, if she did not object. She said no, she did not."

After the letters were issued he testified: "And I met her the next day at the bank in Flushing, stopping at the Attorney-General's office to get the waivers, and got this money from the bank and went over. She told me she was going back to Jamaica, and I told her I was going to New York. I asked her if she would endorse the check and let me have it. She said 'certainly' and endorsed it and handed it back to me."

The learned referee has reported "although the complaining witness is an uneducated colored woman, I am inclined to the opinion that her testimony is substantially correct. I believe it to be her best recollection of what took place as understood by her at the time of the transactions.

"It is evident from the state of the respondent's bank account that he used the money for his personal expenses. He does not deny that he so used the money, but testifies that he had her permission to use it upon the promise that he would repay the amount with interest when the time came to account. On this question it is not unreasonable to conclude from the contradictory testimony that the minds of the parties did not meet and that the transaction was understood by each as they respectively testify. Even though the respondent had permission from her to keep the money until the time came for her to account, as he testifies, it was wrong and violative of sound professional ethics for him, acting as attorney for her as administratrix, to borrow money from her, giving in return neither collateral security nor any written evidence of the debt.

"After the expiration of the year Lavinia Poole through two different attorneys made efforts to have the money returned to her but with no effect. After this proceeding was instituted he began to pay her in installments until the amount aggregated $234.97, leaving a balance still unpaid of $159.98, which he claims should be allowed for professional services rendered."

The learned referee concludes, "upon this state of facts, it is clear that it must be held that the respondent failed in his duty to his client, and is guilty of misconduct in his profession."

A reading of the record and the exhibits satisfies us that the respondent's necessitous condition caused him to appropriate

his client's money to his own use and that his claim that she loaned it to him until such time as she would be called upon to account on the payment of six per cent interest by him to her is not in accordance with the facts. She went to the surrogate's office at the expiration of the year for the purpose of getting her money, and there found for the first time that it had not been deposited, whereupon she commenced her efforts to recover. The fact that respondent has repaid a portion of the moneys so appropriated to his own use during the course of this proceeding is met by what we said in *Matter of Levor* (169 App. Div. 642): "He received his client's money, deposited it in his own bank account, drew it out and used it for his own purposes and until spurred to activity by the charges made against him took no steps toward paying his client what was due her, and showed no disposition or intention of making such payment. This was clearly professional misconduct, and we cannot accept the fact of payment under the spur of disciplinary proceedings as a satisfactory condonation of his offense."

We think the respondent was clearly guilty of professional misconduct and should be disbarred.

McLAUGHLIN, SCOTT, DOWLING and SMITH, JJ., concurred.

Respondent disbarred. Order to be settled on notice.